## Wytheville

F. W. Twyman v. Douglas S. Adkins, Administratrix of Lloyd M. Adkins, Deceased.

June 10, 1937.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

W. W. Beverley, Beverley H. Randolph, Jr., and R. P. Sanford, for the plaintiff in error.

Carter & Williams, Margaret L. Carter, George E. Bendall and Tom Irvin Gill, for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action brought by Douglas S. Adkins, administratrix of Lloyd M. Adkins, deceased (hereinafter referred to as the plaintiff), to recover damages for the wrongful death of the intestate, in a collision between an automobile truck he was driving and an automobile owned and operated by F. W. Twyman (hereinafter referred to as the defendant).

A verdict was rendered by a jury for the plaintiff in the sum of ten thousand dollars. A motion to strike out plaintiff's evidence and to set aside the verdict upon the grounds that it was contrary to the law and the evidence, and because of the granting and refusal of certain instructions, was denied by the trial court.

In view of the jury's verdict and the assignments of error, we will not undertake to set out in detail all of the evidence, but only that portion of it which has a substantial bearing, either on the merits of the case, or on the question of the propriety of the instructions given or refused.

The accident occurred at about 4:20 a. m., October 27, 1935, at a point about five miles west of Danville, on what is called the Mount Cross road, a paved State highway.

Twyman, a foreman employed in the Civilian Conservation Corps Camp, located on the Mount Cross road about eight miles west of Danville, on the night of October 26, 1935, drove his Dodge sedan from the camp into Danville. He then visited a tea room described as a dance hall and drinking place, located eleven miles west of Danville on another route. While at the tea room, he admits partaking of three drinks of whisky, and several witnesses testified that immediately after

the accident there was a smell of whisky on his breath, and that he then talked, walked and acted like a drunken man. He left the tea room around twelve o'clock with a companion, who drove him into Danville. He started on his return trip to the camp about 1 a. m., and just on the outside of the city limits, he picked up four young men enrolled at the camp. After driving about two miles west of Danville, and still six miles from camp, the motor of his car began to give trouble, and it appeared that the gas line was clogged. The road along which they were traveling is practically a succession of slopes or hills with short valleys between. After the trouble developed, Twyman and the young men with him got out of the car, and together pushed it over several hills for a distance of about three miles. Before the scene of the accident was reached one of the young men from the camp left the car and went on to camp. The other three stayed with Twyman, and together they succeeded in getting the car over another hill, and after they had rolled it partly up the next hill, it was pushed back for a better start. When it started to roll forward, or westward again, two of the boys got into the car together with the defendant. The car continued to roll of its own momentum for a short way up the grade westwardly, and when it would not go further, it was permitted to roll back, or eastward until it came to a stop at a low point between two hills. The time was then fixed at about 3:30 in the morning, and the occupants of the car say it then had head and tail lights burning. The two boys, who had gotten into the car before it stopped, had fallen asleep from exhaustion. The third boy, after directing the defendant about parking the car, got into it, and after some discussion with the defendant, they also fell asleep.

At the place where the car stopped, there are guard rails and posts on each side of the road, and the distance between these guard rails is fifteen feet, the width of the hard surface. At a point twelve feet east of the guard rail, on the right-hand side going west, the shoulder of the road is four feet, four inches wide. There was also evidence that at a point fifty or sixty feet away westwardly from the scene of the accident,

the car could have been pushed with slight effort to a broader shoulder completely off the road.

The night was dark, and the atmosphere was heavy and foggy. The color of the defendant's car was described as gray and about the same color as the weather was; and, therefore, difficult to discern as an automobile from any great distance. There was also evidence that later in the morning the fog was denser on the lower portions of the road. The defendant and the boy who stayed outside of the car, testified that it was shoved to the right-hand side of the highway, with its right wheels off the hard surface. Twyman admitted after he had so parked the car, it occurred to him that it was in a dangerous position, and that if he had proceeded one hundred feet, he could have pushed the car entirely off the road. He also admitted that his battery was weak, and that it is possible the lights might have gone off.

A witness, G. E. Scarce, with a passenger in his car, bound east, met and passed the parked sedan from the front around four o'clock, a few minutes before the accident. Both testified that when they discovered the car it was standing still, parked without lights "in the middle of the road if not more", that all four passengers in the car were asleep and when they called to the occupants to "Get that damn thing out of the road!" the man under the steering wheel (who appears to have been Twyman) raised up his head, looked around, said nothing and laid his head back on the seat. None of the occupants of the parked car, however, recall this incident. Scarce stated that when he first discovered the car he was thirty-seven steps away from it, later correcting himself to twenty-seven steps away; and although he was running about forty-five miles per hour, with considerable effort he barely stopped in time to avoid a collision with it. Being in doubt as to whether he could get by, he did manage to stop his car when it was only a yard and a half away. It was then necessary for him to back his car to get in a position to pass on his right-hand side, and in such passing it was necessary for him to come within six inches of the guard rail or fence on his left-hand side and within six inches of the parked car on the right-hand side.

On the same night at 2:45 a. m., Lloyd Adkins, employed as a driver of a milk truck, left a dairy with a load of milk to be delivered in Danville and at the C. C. C. Camp on the Mount Cross road. His brother-in-law, a boy of sixteen years of age, was riding as a helper. After stopping in Danville for a sandwich each, they proceeded towards the camp. The helper, Shelton, went to sleep as soon as they left Danville, and knows nothing more of what happened until after the accident.

The witness, Scarce, testified that after he passed the Dodge sedan, continuing on to Danville for a distance of slightly more than eight-tenths of a mile, he met the truck operated and driven by Adkins, which was running between thirty-five and forty miles an hour with proper lights, and that he had no difficulty in passing the truck and each turned on their dimmer lights for the passing.

It is evident that at the expiration of the time that Adkins took to travel this distance of less than a mile, his truck crashed into the rear end of the Dodge car. The Dodge car was knocked up the hill west a distance variously estimated at from twenty to seventy-five feet to the left-hand side of the road facing west, into and through the guard rail, while all of the occupants of that car were asleep. The impact caused the truck to turn over on its left side, and in turning over the driver, Lloyd Adkins, was pinned beneath the truck and died immediately as a result thereof. In the morning there was some indication of the skidding of wheels of a truck, or some other vehicle for a distance estimated to be about sixty-five or seventy-five feet back of where milk was spilled on the road. There were physical indications that the impact of the crash took place on the left rear portion of the sedan and left front portion of the truck.

The deceased was twenty-nine years of age, and left surviving him his widow, the administratrix, twenty-nine years of age, and three children by that marriage, respectively eight, five, and one years of age. He received from his employers a salary of twenty-five dollars a week, and was furnished with a house, garden, wood, milk and butter for his family.

There were a number of tests and experiments conducted following the accident, to determine within what space the parked sedan could be seen at night by an approaching car with proper lights on, and within what distance it might then be stopped. These experiments were, however, evidently not conducted under the same conditions as those under which the accident happened, because of different atmospheric conditions, the difference in cars, and because the test drivers were specifically looking out for a parked car. Yet, one of the witnesses making a test testified that while driving thirty-eight miles per hour at night with his lights on, he was unable to see another car parked where the Dodge sedan was located on the same road at the time of the accident until he was twenty-seven steps from it, and that although he slapped on the brakes of his car immediately, he skidded fifteen feet beyond the located point of the parked car. He approached from the same direction as Adkins, and further stated that after he got over the top of a hill or knoll about one hundred and twenty steps from the parked car, he had to go over another smaller hill or knoll before his lights went down on the parked car.

Although there are some conflicts in and contradictions of the evidence as above stated, we think that, as a whole, it was sufficient to present for the consideration of the jury the following situation:

The defendant, while distinctly under the influence of ardent spirits, had parked a gray automobile similar in color to the murky atmosphere of that early morning, in the middle of a hard-surfaced, fifteen feet wide highway, with post and guard rails immediately adjoining it, and in general use by the public. In more or less of a stupor from drink and exhaustion, he and his companions had dropped off to sleep in the car at a time when he was conscious of the fact that the automobile was in a dangerous position, both for himself and others using the highway. He had knowingly permitted this situation to continue to exist when by the exercise of only slight additional effort, he and his companions could have pushed the car to a place of safety either backward or forward along

the highway. He knew that his battery was weak, which presented a possibility of poor lights, or no lights at all. Adkins was a few minutes, or a few seconds, before the collision, driving along a State highway without any reason to anticipate a parked car in the center of the road with no lights thereon. There was a small clearance of, perhaps, not more than six inches on either side of the car between the guard rails. On account of the rolling condition of the road, the condition of the atmosphere, the color of the parked car and its position in the road, Adkins with a loaded milk truck had only a few seconds in which to see, know and realize the danger, whether he was twenty-seven steps or thirty-seven steps away. There was no evidence that Adkins was driving the truck with other than ordinary care and prudence, or that he saw, or could have seen, the parked car, situated as it was, in time to have avoided the collision; and he was suddenly confronted, without fault on his own part, with an emergency through the defendant's inexcusable negligence, under the most difficult conditions to avoid.

The first assignment of error is to the action of the trial court in refusing to grant instruction F, in the following form:

"The Court instructs the jury that it is the duty of all persons using the highways to keep their vehicles under control at all times, and have due regard for the conditions of the highway, its width and surface; *and while driving at night, it is the duty of drivers to operate their motor vehicles so that they can stop within the range of their lights;* and in this case if you believe from the evidence that the deceased, Lloyd Adkins, immediately preceding, or at the time of said collision, was operating the truck of the Carlbrook Dairy in such way and manner that he could not stop after he saw, or should have seen, the defendant's car, in the exercise of ordinary care, and such failure on his part contributed to the accident, then you must find for the defendant."

The court gave the above instruction, omitting the words italicized above.

The defendant admits that it has never been held as a principle of law in Virginia, that the operator of an automo-

bile must so operate his vehicle that he can stop within the range of his lights, or within the range of his vision. He contends, however, that the language of Virginia Code 1936, section 2154 (109), is broad enough to cover the proposition. A careful reading of that section, however, clearly indicates that it relates to speed on the highway having regard to traffic and other existing conditions.

He next relies for support to establish such principle, upon legal text writers and cases from other States. It is not difficult to find authority, which holds that it is the duty of drivers to operate their motor vehicles so that they can stop within the range of their lights, or within the range of their vision. Such authority, however, comes from other jurisdictions, and in most cases where there are statutes upon which it can be based. However, in many of these States, it has been held in later cases that the rule has no application in cases of emergencies creating unexpected hazards. *Hart* v. *Stence*, 219 Iowa 55, 257 N. W. 434, 97 A. L. R. 546.

■ ■ The instruction, as asked for, makes it the express duty of the driver, as a matter of law, to operate his vehicle while driving at night, so that he can stop within the range of his lights. A violation of such a rule would make him guilty of negligence *per se*. There is no Virginia statute upon which this can be based.

In the absence of such statutory provision, we think the application of the rule and language asked for here is too broad. It is not difficult to realize that unfortunately and too frequently an unexpected hazard may arise within a space considerably shorter than the range of a car's lights, or the range of the vision of the driver. To make the rule hard and fast would prevent the forward motion of a car meeting another with brilliant lights on a street or highway, or in making left turns. It would frequently present a situation where the stopping of a car on the highway, or the lessening of its speed, would create a greater hazard than to go forward. We are not disposed to hold that a traveler upon a highway must constantly expect his path to be blocked by obstructions placed in its center, or even on the edge of the highway in such a

manner as to impede reasonable travel. We all agree that reasonable care should be demanded of automobile drivers, but that reasonable care is a flexible standard under the facts and circumstances of each case. And after all, whatever the degree of care required, its presence or absence, under the facts and circumstances of each case, is for the jury to determine. *Boggs* v. *Plybon*, 157 Va. 30, 160 S. E. 77; *Kinsey* v. *Brugh*, 157 Va. 407, 161 S. E. 41; *Waynick* v. *Walrond*, 155 Va. 400, 154 S. E. 522, 525, 70 A. L. R. 1014; *Howe* v. *Jones*, 162 Va. 442, 174 S. E. 764; *Tignor* v. *Virginia Electric Power Company*, 166 Va. 284, 184 S. E. 234.

Instruction F, as amended and given, left to the jury to determine from the evidence the question as to whether or not the driver in the instant case, was operating his car in a reasonable manner, under the conditions existing on the night of the accident, and whether or not the driver thereof could have stopped after he saw, or should have seen, the defendant's car in the exercise of ordinary care. This instruction practically covered all the duty that the defendant could require of the decedent under the circumstances here. There was no evidence that the truck was being operated so that it could have been stopped after the position of the parked car became visible to Adkins, under then existing conditions. And there is the related evidence of the weather, of the highway, and of the color and position of the parked car, presenting an emergency in the form of an unexpected hazard.

This case presents some features different from the precise facts of any other case heretofore decided by this court. It is not difficult to differentiate it from the cases of *Kinsey* v. *Brugh*, *supra*, and *Tignor* v. *Virginia Electric Power Company*, *supra*.

The cases of *Waynick* v. *Walrond*, *supra*, and *Howe* v. *Jones*, *supra*, are somewhat closer in points of fact, and each, in a way, embodies the rule applied in Virginia with reference to driving within the range of one's lights.

In the *Waynick Case*, the driver of a motorcycle, after dark, collided with a truck illegally parked on the wrong side of the road with its tail board, extended at an angle of forty-

five degrees or less with the edge of the road, extending half way across the hard-surfaced roadway. The motorcyclist was approaching at a speed of from twenty to twenty-five miles per hour on the right-hand side of the road, when he observed the lights of an oncoming car, and at the same time he saw the dim lights of the truck on the right off the highway. Because the lights of the approaching car dimmed his vision, the rider of the motorcycle did not see the position of the truck on the road until he was within fifteen feet of it, and when he attempted to turn to the left, he struck the truck and was badly injured. It was there contended by the defendant that the plaintiff was guilty of contributory negligence, because he should have seen by the angle of the truck's head lights its presence on the road, and appreciated the danger created by the oncoming automobile. The jury having found for the plaintiff, the court held that the proximate cause of the accident was the gross negligence of the defendant in parking his truck on a dark night on the wrong side of the road, and that there was nothing in the evidence from which contributory negligence could be inferred. Here the motorcyclist was not required to stop because he was blinded by the oncoming lights, as he had no reason to expect that the road would be illegally blocked by the truck.

In the case of *Howe* v. *Jones, supra,* a driver of a car, blinded by approaching lights, permitted his right wheels to slip from the concrete, and when he drove back thereon, the car turned somewhat to the left. He struck the left front wheel of the approaching car, which caused it to swerve left across the road and strike a car which had come to a stop behind the first car. It was contended by the owner of the rear car that the forward car should have stopped when the driver's vision was temporarily blinded by the oncoming lights. This court said that while such a rule was sound in principle, it must take into consideration present-day traffic conditions, and that to require cars to come to a stop when lights interfere, would tie up traffic and prevent travel by night. The court refused to adopt any hard and fast rule. It held that when the vision of the driver of a car is obscured by approach-

ing lights, he must exercise ordinary and reasonable care to increase his diligence, and whether or not he performs this duty, is a question, under the circumstances of each case, to be considered by the jury.

The next assignment of error relates to the giving of an instruction for the plaintiff under the so-called sudden emergency doctrine.

The defendant insists that there was no evidence to support such instruction. It is true that no witness has stated what were the actions of the deceased when he discovered the parked car in the road. However, the evidence which we have hereinbefore recited, showed that there was only a very short distance between the parked car in the center of the road, when it might have been first discovered, and the oncoming truck; that there was scant clearance left in which to pass it on either side; and that there was little time left to the driver to apply the brakes and to make a decision as to which side of the road he should take. There was physical evidence of skid marks on the road, and of the impact of the collision on each of the cars, on the left front of the truck and on the left rear of the sedan, showing an unusual situation arising because of the position of the sedan in the road. There was the evidence of the witness, Scarce, as to the emergency presented to any oncoming driver from either direction.

We can conceive of circumstances where it would be improper to give the sudden emergency instruction, and we insist that instructions should be based upon the evidence. But in this case, the error, if error there be, in granting such an instruction does not justify a reversal of the case.

Regardless of all this, and in view of the fact that admittedly the defendant was guilty of gross negligence, a negligence which the jury has found to be the proximate cause of the plaintiff's injury, the giving of the instruction could only be a technical error. If it had been refused by the court, as we see it, there could have been but one proper verdict, and that for the plaintiff.

It must be remembered that the burden was upon the defendant to show by a preponderance of the evidence, any

contributory negligence of the plaintiff, in order to bar a recovery, and this we think, under the circumstances of the case, he has signally failed to do. As was said in the *Waynick Case, supra,* "The substantive question in the case was whether or not the plaintiff's recovery could be defeated because of his contributory negligence. * * * The defendant cannot escape liability unless there was negligence on the part of the plaintiff which contributed to his injury."

The next assignment of error is to the refusal of the court to sustain the defendant's motion to strike the evidence of the plaintiff, both at the conclusion of the plaintiff's evidence and after the submission of the whole case to the jury.

As we have already indicated, there is sufficient oral and physical evidence before the court to justify the finding of the jury. The defendant invited the disaster to the plaintiff and himself, and should bear the consequences. Under the conditions existing on the night in question, the conduct and acts of the defendant were such as to make the collision not only possible, but highly probable, if not inevitable. He evidenced a complete disregard not only of the law, but the rights of all persons traveling the highway. His actions constituted the proximate cause of the injuries complained of, the natural and probable result of his gross negligence.

This is a case in which there was a distinct advantage in having the opportunity to see and hear the witnesses testify. The learned trial judge, here possessing that advantage, has added the weight of his approval to a verdict of the jury. We do not find any error in the proceeding.

The judgment of the trial court is affirmed.

*Affirmed.*