# Richmond

## Mills E. Godwin, Jr., Adm'r, Etc. v. Camp Manufacturing Company, A Corporation.

January 15, 1945.

Record No. 2827.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Charles B. Godwin, Jr.*, for the plaintiff in error.

*Bowles, Anderson & Boyd* and *J. R. Saunders*, for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The accident which is the basis of this case happened on the 8th day of February 1941 between 1 and 2 o'clock in the morning. George Dempsey Langston, an unmarried man 22 years of age, was driving an automobile from his home, at Gates, North Carolina, to Newport News, Virginia, after attending, with his sister, the "President's Ball" at Gates. His route was northwardly on the Suffolk-Whaleyville highway, which is crossed nearly at right angles, in a wooded section in Nansemond County, Virginia, by a standard gauge railroad, belonging to the Camp Manufacturing Company, a corporation engaged in the manufacture and sale of lumber. It is what is known as a logging railroad, hauling exclusively lumber products, chiefly logs, operating between the Dismal Swamp and the company's saw mill near Franklin, Virginia. The highway extends north and south and the railroad east and west. The railroad operates a log train going west to Franklin each morning and returning in the afternoon. It is only occasionally that late night trips are made. The highway is a State road leading from the city of Suffolk into North Carolina. It is a frequently travelled way and its macadamed surface is composed of top gravel and tar which is dark in color. Very close to the point of the crossing the area is wooded on three sides the effect of which is to shade it. From a curve in the highway going north to and beyond

the crossing the distance is straight for something like a half of a mile without anything to obscure the view.

The plaintiff in error's decedent, Langston, as we have seen, was going north and approached the crossing between one and two o'clock A. M. He was alone. It is in evidence that the usual railroad crossing signs were present and in order. That the one bearing the Virginia legend which announces the presence of the crossing and the legal rate of speed, bore a number of reflectors which illumine when the rays from the headlights of an automobile are in contact with them. Just before Langston reached the crossing an automobile was approaching from the north, being driven by a man named Brinkley whose only companion was a man named Parker. A few moments before this the company's train had approached the crossing and had stopped about 50 feet from the west side of the highway. On the south side of the crossing the company maintains what is called a "bunching place" for the storage of logs which, at this time, were stored out to the highway. West of the crossing there is an incline in the railroad track toward the highway. If cars are left on the track west of this incline unattached to an engine they will roll down and come to rest at the crossing where it is level, unless the loose cars are securely chocked, to prevent it. The brakeman and the fireman, Willie White and David Williams, testified that upon the approach of the train to the crossing they left their positions and went out on the crossing to flag it, each having two lanterns, one white for the purpose of lighting the employee and the other red for the purpose of warning travellers. The fireman "set his red lantern down in the middle of the highway—on the side of the highway, and went back and cut the cars". It appears that they cut out from the train some of the cars to carry them over to the yard for use the next day. Some of them were left beyond the incline and an attempt was made to chock them but this was ineffectual. On account of their momentum they jumped the chocks and rolled down to the crossing, completely blocking it. In the meanwhile the brakeman, after waving the engineer on, caught the rear car and

went up in the yard with the train. The fireman testified that he crossed the track and picked up the red lantern which had been left on the side of the road and "blinded the lights behind a log car" after he had turned the traffic by. Almost momentarily the crossing became blocked, as above stated, and the fireman flagged down the Brinkley car going south. Brinkley testified that the man who flagged him down "set his lantern down" and went up to get an employee to clear the crossing. At this point Brinkley testified as follows: "While he was gone, this Langston came along. I thought he was going to stop. My car was sitting there with the lights on. Hadn't anyone told me to flag him. The lantern was sitting there. He was coming, and I did not think he was going to stop. He was getting close, so I picked the lantern up, and was going to flag him, I guess, but I didn't have time then. I was on the opposite side from him, too." The cars that rolled down the incline were empty and weighed about 15,000 pounds. They were without brakes, unlighted, and at the time of the accident unattended. They carried no whistles or other means of creating a noise to warn of their presence or approach.

The witness Brinkley, when flagged down, parked his automobile on the right hand side of the highway about 10 feet from the track. His headlights were burning, but dimmed, and shone across the top of the empty flat log car.

These cars are about 23 feet long and there are two sets of wheels on the front and on the rear with bolsters over each set of wheels which are connected with what is called an iron draft beam that extends the length of the car and through the middle of it. From the top of this draft beam to the rails below it is 3 feet and 3 inches. The color of the cars blends with that of the asphalt highway. Mr. Culpepper, the sheriff of Nansemond County, after saying that he had had an opportunity in the night time to observe those empty log cars when crossing that crossing, testified as follows: "Those cars are built out of steel, and they are black. They are the same color as the road. The wheels on some of them have

been worn; some are rusty, some are dark, just like the beams of the cars."

The Langston automobile was a practically new 1941 Buick Sedanette. It weighed 3,770 pounds. He drove squarely into the flat car which was across the highway, resulting in his death which occurred the next morning, February 9, 1941, in the Lakeview Hospital, in the city of Suffolk. The front part of his car was demolished. The cost price of the automobile was $1,208. Its fair market value just prior to the accident was $1,075 and the claim adjuster for the General Exchange Insurance Corporation, who inspected it, testified that its fair market value after the accident was $625, though it sold for the sum of $225, which indicates that it was a badly wrecked vehicle. The flat car with which it collided was knocked off of the track, although the wheels had flanges on them several inches in depth, originally, but which had been worn by use. The brass fittings in the journal box were broken and some bolts which held together some of the iron parts were broken off. All of this is strongly urged by the defendant company as indicative of a high rate of speed on the part of Langston. Against this theory is the testimony of the witness Brinkley who said: "It didn't look like he was driving fast," and that of the witness Parker who said that his speed was reasonable. It will be noted that these two witnesses had parked their car on the north side of the track and Brinkley had snatched a lantern from the side of the highway and just an instant before the collision vainly tried to wave Langston down. We mention these facts particularly to show that there was credible conflicting evidence on the question of the reasonableness of the rate of speed at which the deceased was traveling. There was also evidence that he dimmed his lights and applied his brakes, which was detected by the noise of the wheels and the presence of skid marks on the highway.

With respect to the point as to whether Langston was negligent in failing to see the flat cars in time to stop and avoid the accident the witness Clyde Warren, a truck driver,

who often drove his truck over the Whaleyville road and at night, testified as follows:

"Q. What is the color of those log cars with respect to the color of the highway?

"A. Well, the log cars—the wheels are awful rusty—like the highway, the way it appeared to me, and you can get on it—twenty feet of it before you can see the tongs and the wheels. Your lights glare under the tongs, and you can't see anything."

Mrs. Louise Mitchell was a passenger in the Horton automobile which arrived from Suffolk, at the scene of the accident, in time to take the injured man to the hospital, testified that she did not see the log cars until the automobile was within 15 or 16 feet of them.

There was credible evidence to prove that there was no one at the scene of the accident, when it happened, except the two travelers, Brinkley and Parker.

There was abundant evidence tending to prove that it was the custom of the defendant company to have someone there to warn travelers of the approach and crossing of its trains, indeed, it is shown by the testimony of its own employees, including the superintendent and engineer.

Langston had been employed at Langley Field, Va., and in the Newport News Shipbuilding and Dry Dock Company's plant for about five years. In the latter position he worked up to the job of shipfitter. His mother said that it was his habit to come home (Gates, N. C.) nearly every week end and he traveled that same road. We think the jury had the right to assume that he was familiar with this custom and that he had a right to rely upon the company to adhere to it for the protection of users of the highway.

By now it is readily seen that the evidence upon the question of negligence, primary and contributory, is conflicting and therefore it is for the jury. The evidence would not justify this court in holding that Langston was guilty of contributory negligence as a matter of law.

There were two trials of the case in each of which there was a verdict for the plaintiff. They were precisely the

same in the amount of recovery and each of them was set aside by the trial court. The evidence in both cases was substantially the same.

The case of *Perdue* v. *Patrick*, 182 Va. 398, 29 S. E. (2d) 371, recently decided by this court, is somewhat like this in its facts. There we held that the plaintiff, the driver of the automobile, which collided with a truck which was standing upon the side of the highway, was the author of his own misfortune. In that case, however, there was evidence showing that there were lights on the truck and an illumined flare in the road and that there was room for the driver to have passed around the truck. The case here presents a setting which warrants the assertion that the plaintiff was lured to his death.

The law applicable to all of the issues here presented is so well settled that it seems unnecessary to lengthen this opinion by quoting from the cases. We shall be content to cite some of them and make bare mention of the features of a few. In the case of *Norfolk, etc., R. Co.* v. *Wilkes*, 137 Va. 302, 119 S. E. 122, this was said: "But there nevertheless rested upon the defendant the common law duty to use due care to so operate its trains as not to injure others passing over the tracks at grade crossing." "Whether or not the observance of these precautions constituted due care on the part of the company was a question for the jury upon the evidence in the cause, * * * ."

In the case of *Kimball* v. *Friend*, 95 Va. 125, 27 S. E. 901, this was said: "The question whether the deceased exercised due care in approaching the crossing was, as we have seen, peculiarly within the province of the jury."

The last case quoted was cited with approval and the law as there expressed was emphasized in the more recent case of *Southern R. Co.* v. *Campbell*, 172 Va. 311, 1 S. E. (2d) 255.

See also, *Chapman* v. *Hines*, 134 Va. 274, 115 S. E. 373; *Waynick* v. *Walrond*, 155 Va. 400, 154 S. E. 522, 70 A. L. R. 1014; *Twyman* v. *Adkins*, 168 Va. 456, 191 S. E. 615; *Ferguson* v. *Virginia Tractor Co.*, 170 Va. 486, 197 S. E.

438; *Body, etc., Corp.* v. *Matter,* 172 Va. 26, 31, 200 S. E. 589.

We think the trial court erred in sustaining the motion to set aside the verdict in the first trial, we therefore restore that verdict and enter final judgment upon the same for the plaintiff.

*Reversed and final judgment.*

March 6, 1945.

## Upon a Petition to Rehear.

On mature consideration of the petition of the plaintiff in error to set aside the judgment entered herein on the 15th day of January, 1945, it is ordered that the said judgment be set aside and annulled, and a rehearing granted for the purpose of amending said judgment. And this court proceeding to enter such judgment as should have been entered, it is adjudged and ordered that the judgment rendered by the Circuit Court of Nansemond county on the 27th day of August, 1943, be reversed and annulled, the verdict of the jury on the first trial reinstated, and the case is remanded to the said circuit court with direction to enter final judgment on said verdict in favor of the plaintiff, specifying the amount or the proportion to be received by each of the beneficiaries, as provided by section 5788 of the Code.

And it is further adjudged and ordered that the plaintiff in error recover of the defendant in error his costs by him expended about the prosecution of his writ of error aforesaid here.

Which is ordered to be certified to the said circuit court.