# Wytheville

WALKER NEAL v. B. M. SPENCER, ADM'R, ETC.

June 14, 1943.

Record No. 2660.

Present, Campbell, C. J., and Holt, Hudgins, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*W. Moncure Gravatt* and *James S. Easley*, for the plaintiff in error.

*George E. Allen* and *W. E. Neblett,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The subject of this case is an automobile accident which happened in Charlotte county, near Barnes Junction, on route 15, on September 27, 1941. A 1941 Chevrolet coach was driven by M. Houston Kirk, since deceased, whose representative instituted this suit against Walker Neal, who was driving a 1941 Dodge coach. They were traveling in the same direction, south. The two automobiles will be referred to as the Kirk car and the Neal car.

The Kirk car entered route 15 at Barnes Junction by the highway leading from Chase City. The Neal car entered the same route by the highway leading from Clover. The Kirk car turned into route 15 first. It was followed by the Neal car approximately a mile. The two cars were traveling from 60 to 90 feet apart. They were approaching a road numbered 631, which intersected route 15 at an oblique angle of about 30 degrees. Kirk and his companion, Harding Walker, intended turning in on this road to visit some friends. About 105 feet before reaching this intersection Kirk held out his hand to indicate a right turn and slackened his speed by applying his brakes. This movement made his stop light flash on. His speed was reduced to about 20 miles per hour and when he was about 45 feet from his turning point the Neal car struck the right of the rear end of his car and knocked him out of his seat and broke the seat hinges and also its fastening to the floor. It was about dark when the accident happened and the lights were on on both of the cars. The Neal car skidded between 127 and 141 feet before the impact. This was shown by skid marks which were plainly discernible after the acci-

dent. Kirk recovered from the shock sufficiently to stop his car when it had gone about 60 feet. The occupants of the Kirk car said that they were not hurt.

Kirk was 21 years old. He was 6 feet 2 inches tall and weighed from 150 to 160 pounds. He was rated at school as a 5 point boy, which indicated sound and robust health. He had never been sick or ill and was accustomed to doing all sorts of farm work. The evidence fully justifies the statement that he was physically fit prior to the accident.

The accident happened on Saturday evening and on the next morning at Sunday School Mr. J. L. Davis, a merchant and farmer in the neighborhood, noticed that "he seemed to be in right bad condition." Some ten days after the accident Mr. E. T. Spencer, who operated a school bus, saw him at church and asked him if he was hurt very badly. He said: "Shook me up right much, hurt my neck and it hurts me to turn my neck, my shoulder and my back."

His father, who was in Canada at the time, but who came home on the following Tuesday, was asked if he noticed any difference in him and he said that he certainly did, that he was trembling as he tried to walk, and was pale, haggard looking, dark circles under his eyes, and he could not walk steadily. Another difference was that he could not work as he was accustomed to. He said that he lost weight to the extent of almost a pound a day and that eleven days before his death, in the act of tying some tobacco, he reached over to get some and that he fell back in a faint, losing consciousness for a little while.

On the 19th of October he went to see the family physician, Dr. Bailey, who, after an examination, made the following statement: "I found him in a state of extreme weakness, lost a great deal of weight since I had last seen him, about a month prior to that time. He was hardly able to get his breath. His blood pressure was 88 over 60, his pulse rate 140 per minute, heart sounds very weak. The lungs were, in the left posterior especially, filled with crepitant rales; he was bruised between his shoulders, especially on the left." This doctor said that he had never before

been called to see him on any occasion for sickness of any kind.

Mr. Paschall, principal of the Victoria High School, testified that the deceased was at an entertainment at his school for the benefit of the Parent-Teachers Association about a week preceding his death and that he asked him how he was getting along and he said that he wasn't feeling very well, that he couldn't sleep; that he came down there with the hope of diverting his mind, and that he got up and staggered out of the auditorium for fresh air.

On Saturday, the 27th of October, young Kirk drove with his mother and father to North Carolina to visit some relatives. The place in North Carolina was some 200 miles distant. Before deciding to take this trip the young man went to see Dr. Bailey to obtain his permission. The younger Dr. Bailey, who had examined him previously, was not available but his father, who is also a physician, gave him permission to make the trip. The father and son alternated in driving the car. They reached their destination in the early evening. Mrs. A. B. Hobson, the aunt of young Kirk to whom the visit was made, said that she noticed after their arrival that the young man was pale and that he laid down on the davenport the greater part of the evening and that he was thinner than he was when she had seen him four months before.

After breakfast the next morning he went out to the stable with Mrs. Hobson's sons, his cousins, and when they returned she handed him a broom and asked him to sweep off the hearth. After making a few strokes he slumped down at his father's feet and expired.

This statement of the facts is made in the light most favorable to the plaintiff's intestate, that is, it is made in accord with the evidence introduced by him. This we are required to do because he comes to us with the verdict of the jury, approved by the court.

The mere recital of the incidents reveals a progressive course of deterioration of the vigor and strength of the deceased from the accident to the time of his death. We

have an irrefutable setup of cause and effect. Certainly there was abundant evidence upon which the jury could predicate its verdict and we say without hesitation that if what we have referred to and pointed out were all the evidence in the case it would be sufficient to negative the soundness of the three assignments of error presented by the defendant.

The defendant assails with much vigor the testimony of three physicians, introduced as experts by the plaintiff, who were asked to answer a hypothetical question, as to the cause of the death of the young man, the question embracing, or intended to embrace, the facts proven and to be proven. The objection is founded upon the contention that the question was too meager as to the existent facts, and that the facts, themselves, were too meager upon which to base any opinion outside of the realm of speculation and conjecture.

Text law and cases are cited showing that certain courts and law writers look upon this character of evidence with disfavor because, forsooth, the opinions of experts is too often the natural and expected result of their employment.

The case of *Lawson v. Darter*, 157 Va. 284, 293, 160 S. E. 74, is cited, and with the quotation from it we are in accord. It was there said:

"In matters of this kind which are not of common knowledge we much accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached, and so evidence of this kind is competent unless it is palpably absurd, and it is not made incompetent by the fact that other experts may have reached another conclusion. Always it should be scrutinized with care, but the manner in which it is weighed has nothing to do with its admissibility."

We have time and again accepted this character of testimony and held it to be competent, safeguarding it by a warning to the jury that it should be scrutinized with care. This was done in this case by instructions "D" and "E" granted to the defendant without objection.

We are impressed by the fairness and fullness of the hypothetical question propounded and the conclusiveness of the answers and the apparent absence of bias.

Dr. Beath, an eminent physician, in the art of traumatic surgery, testified that while the facts recited in the question were too meager to decide in detail what pathological process, what actual organ had the certain condition in it which caused his death, yet they were not too meager to decide that the boy died of the accident.

Dr. Bailey gave the following answers to the following questions:

"Q. Now, Doctor, your own examination of the boy and your knowledge acquired from your own examination—what have you to say on that basis as to the cause of his death?

"A. If I had been with the boy at the time of his death it would be impossible to state just exactly what lesion or what particular condition was the cause of death, but we do feel that the accident was the beginning, was the beginning cause.

"Q. Have you any doubt in your own mind on the subject of whether the accident was the cause of this young man's death?

"A. No, sir."

Dr. John Owen testified as follows:

"Q. You stated, of course, you cannot say with any absolute certainty what caused the young man's death?

"A. No, sir.

"Q. The most probable cause, and what you think probably caused his death was the injury sustained in the accident?

"A. Yes. Resulting in traumatic embolism.

"Q. You feel reasonably certain of that?

"A. I think that can explain all the symptoms."

The defendant introduced a number of physicians of excellent repute who entertained a different view but the jury chose to accept the plaintiff's evidence, which was within their province.

The verdict was for $6,500.00. The court approved it. We think there was an abundance of evidence to justify both.

The evidence strongly tended to show that the Neal car was being driven at a rapid rate of speed. It is true that Neal testified that he was driving between 50 and 55 miles per hour, which was within the law, but Harding Walker, Kirk's automobile companion, said that the speed of the Neal car was 60 or 70 miles, and his reason for this estimate was hearing the noise made by the Neal car as it was skidding. He frankly stated that he never saw the car following them until he got out of the Kirk car. There is likewise no evidence that young Kirk saw it or knew that it was following. The force of the impact which has been described, and the length of the skid marks of the Neal car import a high rate of speed.

We think too that the jury might reasonably have believed that the Neal car was not under control of the driver, else he would have passed the Kirk car on the left rather than run into it. It will be noted that there was no other traffic on the highway in either direction at the time of the accident.

We conclude that there was sufficient evidence to impress the jury that the defendant was driving at an unsafe rate of speed; that he did not have proper control of his car and that he was not keeping a proper lookout.

We further conclude that there was not sufficient evidence to fix upon young Kirk either contributory or concurring negligence. He slowed down by applying his brakes. This caused his stop lights to be visible, indeed, Neal testified that they were on; he gave a right turn signal, in short, he did everything that he reasonably could have done in the circumstances.

In Cyclopedia of Automobile Law, (Blashfield) volume 1, page 425, section 1, is the following:

"While the driver of a vehicle must be constantly on the watch for dangers in front, he is not, if he is on his proper side of the highway, required to maintain such a

lookout as to vehicles coming up from the rear, and the rule is that, when two automobiles are being driven along a public road in the same direction, the driver of the front car owes no duty to the car in the rear except to use the road in the customary way, and until he has been made aware of the presence of such rear car by signal or otherwise he may assume, either that there is no other vehicle in his rear, or that, if there is one there, it is under such control as not to interfere with his free use of the road in any lawful manner."

Idem. Page 426, section 2.

■ "Under such statutes the general rule is that, where two automobiles are traveling in the same direction, the one in front has the superior right and may keep its position in the center of the highway if there is sufficient space on the left to enable the approaching car safely and conveniently to pass."

The statutes referred to are those which regulate the matter of the side of the road travelers shall use in passing each other.

We think the general principles enunciated by the text is applicable to the situation with which we are dealing.

The authorities cited as upholding the text are: *Standard Oil Co.* v. *Carter*, 210 Ala. 572, 98 So. 575; *Mark* v. *Fritsch*, 195 N. Y. 282, 88 N. E. 380, 133 Am. St. Rep. 800, 22 L. R. A. (N. S.) 632.

■ We have often said that where a party litigant comes to this court fortified by the verdict of a jury, approved by the trial court, he occupies the strongest position known to the law. It seems quite unnecessary to more than cite a few of the cases. See *Temple* v. *Ellington*, 177 Va. 134, 12 S. E. (2d) 826; *Yellow Cab Co.* v. *Gulley*, 169 Va. 611, 194 S. E. 683; *Yellow Cab Corp.* v. *Henderson*, 178 Va. 207, 16 S. E. (2d) 389.

As to what we have said with respect to the testimony of experts elicited by asking a hypothetical question see *Blue Ridge Light, etc., Co.* v. *Price*, 108 Va. 652, 62 S. E. 938; *Barnard Bus Lines* v. *Weeks*, 156 Va. 465, 158 S. E. 870;

*Bowen's Ex'r* v. *Bowen*, 122 Va. 1, 94 S. E. 166; Jones on Evidence, Third Edition, page 559, section 371; 1 Wigmore on Evidence, 2d ed., pages 1090, 1093.

The learned judge of the trial court reached the gist of the matter when he said:

"However, it does seem to me the mere facts of the case, from a common sense view point, give the jury sufficient grounds, and particularly with the testimony of the different experts who testified, gave them sufficient grounds to have found a verdict the way they did. I cannot say that the verdict is without evidence to support it, and that it is not supported by the evidence. So therefore your motion to set aside the verdict will have to be and it is here overruled."

The judgment of the trial court is plainly right and it is accordingly affirmed.

*Affirmed.*