# Richmond

## CLYDE E. PERDUE v. O. W. PATRICK AND LEE COMPTON LINES, INC.

March 13, 1944.

Record No. 2752.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Walter H. Scott* and *T. W. Messick*, for the plaintiff in error.

*John J. Wicker, Jr.* and *Kime & Hoback*, for the defendants in error.

BROWNING, J., delivered the opinion of the court.

The accident which is the subject of this suit happened on June 13, 1942, about ten o'clock at night. It was on Federal Route 11 known as Lee Highway. It was a collision between a 1942 model Mercury sedan driven and owned by Clyde E. Perdue, who was the plaintiff in the trial court, and a truck owned by Lee Compton Lines, Inc., and driven by O. W. Patrick, who were the defendants in the trial court. It was at a point on the highway about 75 or 80 feet west of the Virginian Railway crossing at or near a station called Kumis. Both drivers were young men. Perdue was traveling east toward Roanoke and the truck was bound in the same direction. At the time of the accident the truck was on the right side of the highway but was stationary. It had stopped on account of a passing train. Patrick tried to start it in order to continue on his way after the train had passed over the crossing but found that his engine had stalled. The truck consisted of a tractor and a trailer. The front end of the tractor was between 25 and 40 feet west of the crossing and the rear end of the trailer between 68 and 75 feet west of it. The truck occupied the greater portion of the right side of the highway. It was only about two feet from the paved portion of the highway to a ditch which was 4 feet deep. The paved portion of the highway was from 19 to 20 feet wide. It was 15 minutes from the time the truck became stalled to the time of the accident. Perdue drove squarely into the rear of the trailer. He said his speed was 25 miles per hour. He was injured quite severely, necessitating hospitalization for several days and medical care for a much longer time. His car was demolished. It was practically new, had only been driven about 10,000 miles, but after the impact it was described as being worthless, even as junk. The tires alone were worth salvaging. The force of the impact jammed the automobile underneath the rear axle of the trailer from which it could not be released except by a wrecker operation.

Perdue instituted an action for damages by notice of motion for judgment on account of his personal and property injuries. There was a verdict for $5,000.00 in his favor. The jury viewed the scene of the accident as well as the truck. The court sustained a motion to set aside the verdict and gave judgment for the defendants, stating that the evidence, particularly that of the plaintiff, himself, showed that he was guilty of contributory negligence as a matter of law, which proximately contributed to the collision.

Undoubtedly under numerous decisions the situation here necessitates the acceptance by this court of the evidence in its light most favorable to the plaintiff. We cannot, however, leave out of view the force and effect of existent physical facts and uncontroverted testimony supporting a contrary theory.

The truck was composed of two units, a tractor and a trailer, of a total length of 38 feet, 8 inches. Its height from the ground to the floor is 3 feet and 9 inches. The entire height of the vehicle is 10 feet and 11 inches. About the time of the accident an automobile proceeding west driven by a man named Palmer was approaching the crossing, and immediately before the accident and just ahead of the plaintiff, an automobile driven by a young man named Hall going east passed around the truck. He asked Patrick what the trouble was and upon being informed that he could not get his engine started he stopped to help him. There were no shoulders where the truck was stalled upon which it could have been driven off the highway.

In the plaintiff's automobile were found a rifle, the metal barrel of which was bent, the works of his wrist watch were out of the case on the floor, and a pint bottle of whiskey, purchased that day by some one from an A. B. C. store. The latter was intact but the rifle was "completely ruined" and the watch dismembered by the shock of the impact. Perdue said he knew nothing of the whiskey; that he had not purchased any and had not been drinking before the accident and had never bought any of that brand. The

driver said the force of the impact was hard enough to "knock the back seat loose in the cab."

That the truck was stalled on the highway was purely accidental. That it was in the precise place, which it oc-cupied, was proper for it had reached a point beyond which it was unsafe to go on account of a passing train. The driver was working to get his engine to start from which he might momentarily expect success. Experience and observation justifies this statement. As to this feature he said in response to an appropriate question:

"After the train passed I tried to start it. I had the lights on bright and I thought maybe because the lights was on I could not get enough juice from the battery so I could start and so I cut the head.lights down to parking."

When the truck stalled the first thing Patrick did after trying to start the engine was to put out a flare. There is some conflict as to where it was placed but the testimony shows that it was on the highway at a point near the junction of the tractor and trailer off to the side near the white center line. The driver tried to put out two other flares in accordance with the statutory requirement but they would not illuminate.

The testimony is positive that the one flare was present and illuminated. All of the witnesses, who were in a position to observe, saw it.

The plaintiff was asked:

"Q. Did you see any flare out beside the truck?

"A. I had just a momentary glance of some kind of a light to the left of the truck; I do not know whether it was a boy with a flashlight or flare or what it was."

Two of the plaintiff's witnesses testified as to this.

Edward Palmer, who was driving the car going west and approaching the railroad track said, in answer to a question as to what he saw:

"As I came around the curve I saw the headlights on the car, and a flare approximately on the west of the road—that was the way I taken it. When I got within sight of the truck, the lights went off, flashed on again, and off again.

I got up a little nearer, I would say within 75 or 100 yards, the gentleman standing at the front of the tractor motioned me around, and as I got around——

"Q. What did he motion you with?

"A. A flashlight—as I got near the back end of the truck I saw the car coming, and it crashed, so I pulled over to the side and stopped."

Everett Martin, who was a passenger in the Palmer car, riding on the back seat, said that he saw the orange flare and a man waving a flashlight and was questioned as follows:

"Q. Had the driver of your car slowed up?

"A. Yes, sir.

"Q. What made him slow up?

"A. He saw that flare."

The evidence of the plaintiff is abundant to establish the fact that immediately before the crash the lights of the truck, both tractor and trailer, were intact and functioning. The testimony of Palmer and Martin as to the lights flashing on and off corroborates that of the truck driver, that he was dimming his lights in an effort to get more current to start his engine.

When the two flares he tried to place failed to work, he borrowed a flashlight from Hall and had him wave it endeavoring to warn passing motorists of the presence of the truck. This effort was effective in the case of Palmer and Martin but it was unheeded by the plaintiff.

It is well to state that on the night of the accident the weather was fair and the road was dry. It was straight for a thousand feet on either side of the point of collision. The view in either direction was unobstructed. The plaintiff does not claim that he was blinded or his vision impaired by the lights on Palmer's car. The latter had either dimmed his head lights or tilted them down. There were signs at the crossing on either side about 200 feet distant announcing its presence and carrying these words: "Railroad crossing 200 feet ahead—Slow down 5 miles, Virginia Law." These signs are constructed with what are known as "cat-eyes" which illuminate by reflection caused by the headlights

of approaching cars shining upon them. The light produced makes legible the legend on the signs. It is to be noted that there were two of those "cat-eyes" on the rear of the trailer and that they were in order and the plaintiff's car was driven into the trailer between them. His car was equipped with four-wheel automatic brakes and his lights were in good condition.

The sheriff of Roanoke county and two of his deputies went to the scene of the accident a short time after it occurred and made an examination of the conditions. They said that they found heavy black skid marks made by all four of the wheels of the plaintiff's car extending a distance of 19 steps or 57 feet prior to striking the trailer. This testimony is uncontradicted. There was an ineffectual effort made to parry its effect by the testimony of the plaintiff's sister and her husband who said they went to the place on the next day and did not see any skid marks but it appears that they simply drove along the road and looked about. There were five persons in their automobile. None of them got out to make an examination of the road and the two who testified were sitting on the back seat. They did not stop their car. This could hardly have been a satisfactory refutation of the positive testimony of the existence of the skid marks.

The vagueness and inaccuracy of the plaintiff's testimony is noteworthy when it is carefully analyzed. We quote extracts from it upon important features:

"Q. As this car approached you, coming from the east, you say you think that it got up near the rear end of this trailer just about the time you crashed into the trailer. When it got up near the front end, did you see the trailer outlined at all in the lights of that on-coming car from the east?

"A. No, I never did see the trailer outlined at all; never did see it until I hit it.

"Q. Never saw it at all until you hit it?

"A. Just a momentary glance until I hit it.

"Q. You do not know whether it had lights on it or not, do you?

"A. No.

"Q. You do not tell the jury it did not have lights on it?

"A. No.

"Q. You never saw those cat eyes?

"A. If I had seen lights on it, I would have stopped. If I had saw a thing whatsoever, I would have stopped.

"Q. And you just remember getting a momentary glance which you call flash of the light there on the left?

"A. Yes, I seen a light; just a momentary glance of it."

The following partial examination ensued:

"Q. If this tractor and trailer hooked to it at the very point when your automobile did crash into it, the rear of it, if it had been travelling 5 miles an hour instead of being still or stopped, would you not have hit it just the same?

"A. If this had been anywhere else besides at the railroad crossing, I would never have hit it any way; I was watching the railroad. The difference between the accident and my seeing the truck with no lights on it was the time I taken to look up the railroad for oncoming train and back —the trailer probably came into my range of vision which, with low lights on the car, I would say would be 30 feet— low lights don't travel more than 35 feet in front of a car, I don't think. That is the whole thing how come me to hit that trailer parked up there with no lights on it was because I looked up the railroad for an oncoming train. I was watching the railroad, and it was not in my range of vision when I looked up and from my lights shining on the back end; when I looked back to proceed on towards Salem, I hit it."

From the facts which we have emphasized it becomes increasingly apparent that the plaintiff reached a crisis in the series of events which was caused by his lack of control of his car on account of the speed he was making. He could not relieve himself from the perilous situation which he had created. He could not stop in time to avoid the consequence of a hazard of his own making. Just ahead of the

plaintiff Alvin Hall traveling in the same direction saw the truck and drove around it. It is true that he saw the rear lights on the trailer but he also said that as he drove up behind the truck he saw the flare and had no trouble in seeing it. The complete destruction of the car, and some of the articles in it, the breaking loose of the seat in the cab of the tractor, which was 38 feet in front of the point of the impact, the impotency of man power to extricate the automobile from the truck, the necessity of the employment of a wrecker for this purpose and the skid marks extending 57 feet, all point unerringly to the fact that the plaintiff was the author of his own undoing.

■ The situation of the truck was impermanent and might happen at any moment in the course of a journey. It could not involve a degree of foreseeableness which might result in efforts which would prevent the possibility of its happening. It was simply unavoidable. Everything humanly possible to be done was done by the driver to save the motor traveler from disaster. The plaintiff saw the truck—he said he did—but he could not slacken his speed sufficiently to bring his car to a stop. His description of his seeing the flare and the truck as, "just a momentary glance," was tellingly accurate in the light of his inevitable speed. As we have already seen from a portion of his testimony hereinbefore quoted his explanation of his failure to see the truck in time to avoid the accident was that he was keeping a statutory lookout north and west, lest a train should be passing. This is unimpressive for the reason that he was aware of the presence of the crossing. He was admittedly familiar with the legal duty to reduce his speed upon approaching a grade crossing so that it would not be greater than five miles per hour at a distance of fifty feet from the. nearest rail of the railway tracks. If he had been obedient to this statutory mandate there would have been time and opportunity to look out not only for trains but for the more immediate danger of a possible stalled truck or automobile on the highway between himself and the railroad tracks.

Incidentally neither the "cat-eyes" on the crossing signs nor those on the rear of the trailer had any significance. He never saw them.

By now it is quite evident that we are in accord with the judgment of the trial court. His disposition of the case was eminently correct. The plaintiff was guilty of contributory negligence which was the proximate cause of the accident and his own evidence and the physical facts establish it.

Authorities which are applicable and enlightening as to the phases of the case which we have discussed are here cited and quoted:

In the case of *Bohlkin* v. *Portsmouth*, 146 Va. 340, 348, 131 S. E. 790, 792, 44 A. L. R. 810, it was said: "It should be remembered that the duty of the trial judge to set aside a verdict of the jury where the same is not justified by the law and the evidence is just as imperative as is the duty to sustain the verdict where a contrary condition exists."

The case of *Huffman* v. *Jackson*, 175 Va. 564, 9 S. E. (2d) 295, involved a collision between two automobiles. This court reversed the judgment of the trial court in favor of the plaintiff and gave judgment for the defendant. It said through Mr. Justice Eggleston on the question of speed, where state markers were erected and on the question of the force of the impact as to speed:

"By his own testimony Jackson admits that he was proceeding at an unlawful speed of from 30 to 35 miles per hour through the village of Bonsack when the highway sign indicated to him a permitted speed of only 25 miles per hour. The force of the impact, the fact that the Huffman car was driven back a distance of 21 feet, and the complete demolition of both cars indicate that the speed was far greater than Jackson's estimate."

See also the case of *Barry* v. *Tyler*, 171 Va. 381, 388, 199 S. E. 496, in which, through Mr. Justice Spratley, this court, in speaking of the effect of physical facts, said:

"Inferences drawn from physical facts may be as strong as direct evidence. Such inferences amount to circumstantial evidence. Facts may be proven by circumstantial evidence as well as by direct evidence. An instruction can be based on inferential or circumstantial evidence. *Norfolk & W. R. Co.* v. *Richmond Cedar Works,* 160 Va. 790, 170 S. E. 5; *C. & O. Ry. Co.* v. *Ware,* 122 Va. 246, 95 S. E. 183."

In the case of *Penoso* v. *D. Pender Grocery Co.,* 177 Va. 245, 13 S. E. (2d) 310, in which the trial court set aside a verdict for the plaintiff in an automobile accident case involving a truck and entered judgment for the defendant, which was approved by this court, we said through Mr. Justice Gregory:

"It is true that questions of negligence, contributory negligence, and proximate cause are generally for the jury. However, where the derelictions of a party are of such a degree that no reasonable man could fail to deem them negligence, and where the causal connection between these derelictions and the injury complained of is perfectly plain, the court may withdraw these questions from the jury. There is no jury question where reasonable minds may not conflict.

"Once the negligence of the plaintiff is settled, all other questions go out of the case. We have no doctrine of comparative negligence in Virginia in such cases; the disclosure of negligence on the plaintiff's part provides the defendant a complete defense and precludes any recovery by the plaintiff."

See also, *Nicholson* v. *Garland,* 156 Va. 745, 158 S. E. 901; *Richmond Coca-Cola Bottling Works* v. *Andrews,* 173 Va. 240, 3 S. E. (2d) 419; *Temple* v. *Ellington,* 177 Va. 134, 12 S. E. (2d) 826; *Harris* v. *Howerton,* 169 Va. 647, 194 S. E. 692.

In each of the cases: *Armstrong* v. *Rose,* 170 Va. 190, 196 S. E. 613, *Ferguson* v. *Virginia Tractor Co.,* 170 Va.

486, 197 S. E. 438, and others cited by the plaintiff, there were facts, quite controlling, which clearly differentiate them from the present case. To point them out would make this opinion much too long.

We affirm the judgment of the trial court.

*Affirmed.*