# Richmond

JOHN HAMILTON WALROD v. RONNIE D. MATTHEWS.

December 1, 1969.

Record No. 6996.

Present, All the Justices.

*George E. Allen; James A. Eichner (Allen, Allen, Allen & Allen, on brief), for plaintiff in error.*

*J. Segar Gravatt; M. Wallace Moncure, Jr. (Moncure & Cabell, on brief), for defendant in error.*

COCHRAN, J., delivered the opinion of the court.

John Hamilton Walrod brought an action against American Engineers and Ronnie D. Matthews for personal injuries incurred when an automobile operated by Walrod was struck by a station wagon owned by American Engineers and operated by Matthews.

At the conclusion of plaintiff's evidence a motion to strike the evidence as to both defendants was sustained as to American Engineers and overruled as to Matthews. At the conclusion of defendant's evidence the motion to strike the evidence was renewed by Matthews and again overruled. On June 30, 1966, the jury returned a verdict in favor of Walrod against Matthews in the sum of $30,000. Counsel for Matthews moved the court to set aside the verdict, and on November 10, 1966, the trial court entered an order setting aside the verdict and granting a new trial on the ground that the jury had been misdirected.

The new trial was held on January 23, 1968 and resulted in a verdict for defendant. Plaintiff's motions to set the verdict aside and grant a new trial and to reinstate the original verdict of June 30, 1966 were overruled by order entered March 12, 1968. We granted plaintiff a writ of error. Defendant has assigned as cross-error the actions of the trial court in admitting the opinion testimony of the expert witness, George Hunt, and in overruling defendant's motion to set aside the first verdict and enter judgment for defendant.

This accident occurred on July 24, 1964 at about 1:30 A.M. on U. S. Route 460 in Nottoway County approximately seven-tenths of a mile west of the corporate limits of the Town of Crewe. A 1957 Ford sedan, driven by Walrod, was proceeding west in the westbound lane of traffic on Route 460, a two lane highway marked with a white center line. A 1958 Plymouth station wagon, driven by Matthews, was traveling east on the highway. The accident occurred when the station wagon crossed the center line of the highway and collided with the sedan in the westbound lane.

A consulting engineer, George Hunt, was called as an expert witness by plaintiff for the purpose of proving that the accident resulted from a defective steering mechanism on the station wagon which in the exercise of ordinary care should have been known to Matthews. Indeed, it is upon Hunt's testimony that plaintiff's case stands or falls.

Hunt testified in detail that the mechanical failure was the separation of a ball and socket joint causing the lower right front control arm to fall, thereby rendering the right front wheel uncontrollable. In his opinion the socket had previously been split by a shock or blow

and thereafter widened until the ball slipped out of the socket and the control arm fell down. When asked to explain how the station wagon was caused to veer to the left rather than to its right he answered as follows:

"One would expect when this right control arm fell on the road and started dragging on the road, providing the driver did not do anything, it would tend to go off the road to the right. But the skid marks, and the fact that he did go off to the left, is ample evidence in my opinion that he applied the brakes forcibly, and not having any brakes on this wheel at all, because this wheel was just dangling by the upper control arm and no weight of the vehicle was on that wheel, then by applying the brakes hard to the left wheel, the car would veer to the left abruptly and sharply, as it did."

After the jury verdict was returned for plaintiff the trial judge concluded that in view of Hunt's testimony explaining why the station wagon suddenly veered to its left he had erred in not giving a "sudden emergency" instruction tendered by defendant. Accordingly, the verdict was set aside and a new trial granted.

We are called upon to determine whether it was error to set aside the verdict for failure to give a "sudden emergency" instruction at the first trial, and if so, whether there was evidence to support the verdict.

It is clear from the record that plaintiff's case was based entirely on the theory that Matthews was negligent in operating the station wagon on the highway when there was a defective condition in the steering apparatus which was known or in the exercise of ordinary care should have been known to him. It is equally clear that defendant's case was based entirely on the theory that Matthews neither knew nor had any reason to know that there was any defect in the steering mechanism. The case was tried on this narrow issue and the jury was instructed thereon as follows:

## "INSTRUCTION NO. 1

"You are instructed that if you do believe from a preponderance of the evidence that the defendant did know or in the exercise of ordinary care should have known that the said steering mechanism was defective and thereafter operated said motor vehicle upon the

highways, you should find your verdict for the plaintiff and assess his damages in accordance with the Court's instruction on damages."

## "INSTRUCTION NO. 8

"The Court instructs the jury that the evidence conclusively establishes that the collision in this case occurred upon the plaintiff's right side of the highway.

"The Court further instructs the jury that the evidence further establishes that the defendant's motor vehicle moved from its own right side of the highway across the center and unto the left side of the highway because of the separation of a ball joint of the steering mechanism of the defendant's motor vehicle.

"And you are further instructed that unless you believe from a preponderance of the evidence that the defendant knew or in the exercise of ordinary care should have known that the steering mechanism was defective and thereafter operated said motor vehicle upon the highway, you should find your verdict for the defendant."

■ The court refused a properly worded "sudden emergency" instruction tendered on behalf of defendant.

Defendant was only entitled to have the jury fairly instructed as to his theory of this case. In *Poole* v. *Kelly*, 162 Va. 279, 173 S. E. 537 (1934), plaintiff's theory was that the accident was caused by reckless driving and excessive speed on the part of defendant. Defendant's theory was that he lost control of his car due to some mechanical defect in the accelerator pedal. A "sudden emergency" instruction was refused since the court had given an instruction that the jury should find for defendant if they thought it "just as likely that the injury and death . . . was caused by some defect in, or the getting out of order of, the steering gear, accelerator or some other part of the car". This court approved the ruling of the trial court.

Here, Walrod did not undertake to prove any negligence on the part of Matthews in operating the car into the wrong lane of travel after the control arm fell down and dragged on the highway, nor did he offer any instruction to this effect. Thus, we do not have a sudden emergency question because defendant is not required to explain his actions after the steering control failed. Furthermore, any emergency arising afterwards would have been caused by defendant's negligence in going upon the highway and the emergency doctrine could not be

invoked by him. *Bloxom* v. *McCoy*, 178 Va. 343, 17 S. E. 2d 401 (1941); *So. Passenger Motor Lines* v. *Burks*, 187 Va. 53, 46 S. E. 2d 26 (1948); *Terry* v. *Fagan*, 209 Va. 642, 166 S. E. 2d 254 (1969).

We conclude that the jury was adequately and properly instructed in accordance with the theories of plaintiff and defendant and that no "sudden emergency" instruction was justified. It was therefore error for the trial court to set aside the first verdict and grant a new trial on the ground that such an instruction should have been given.

We now consider the admissibility of evidence and its sufficiency.

The expert witness Hunt, first employed by defendant but whose findings were made available to both sides, was plaintiff's chief witness. His testimony was based upon his study of the broken parts of the steering apparatus and his observation of the condition of the underside of the station wagon. In his opinion the accident was caused in this manner:

> "The condition of this socket, and the fact that it did part, and the abrasion on the bottom of it, which shows it came from contact of the vehicle in motion, is without question as a result of some prior injury to this socket joint, which split it and weakened it, so that over a period of time—and I cannot evaluate this period of time—it may be in a day or two, or it may be in a week or two, or it may be even longer than that, but at some time, that socket was damaged because the control arm presumably struck some obstacle, and with sufficient force to crack this and to start this whole chain of events.
>
> "And, subsequently, when he was going down the road, just a moment or two before the accident, these things came apart and this was definitely the cause of the accident."

When asked whether or not the split in the socket would have had any effect upon the operation of the vehicle he gave his opinion that the steering would have been affected. He continued:

> "Any force of sufficient magnitude to rupture that socket would surely displace the control arm from its proper position, and the result of this would be that the car would have a tendency—and now, please don't ask me to evaluate this tendency because I don't know whether it would be slight or severe—but there should be some tendency that the car would pull to the left or right; in this case to the right. This would be the most probable result of this.

There might be other things that would be noticeable, such as in rough driving, or uneven roadway, this might make some additional noise, because obviously there was considerable play in this after it was split, and it is this play that kept beating on it until it enlarged it until it came out. So, I would expect there would be some noise attached to this also, that would not be common to the automobile ordinarily."

Hunt was emphatic in his opinion that the control arm assembly had previously struck something which split the socket. He was then asked if a person lacking his technical experience might have failed to notice the tendency of the car to pull to the right and replied that he thought "anyone would notice this", although it was possible that an inexperienced person might not.

According to Hunt the original split in the socket, which might have been a "hairline" or minute crack not readily observable, would thereafter have opened up from "a repetitious series of bumps". Although it was not impossible for this to have resulted from one "whopping big bump", he considered this "highly unlikely". He agreed that the driver would be the one to say whether the car pulled to one side or the other.

William Nelson Gravatt, Norman Taylor and William C. Boswell, Jr., three young fellow employees of Matthews, testifying for plaintiff, described the hard use the station wagon had received. Gravatt drove it every day from early June until he quit work the middle of July. It was used to transport survey crews and equipment to and from work. It was driven and parked in fields, "a number of times, the bottom of the car would drag the ground", and it occasionally became stuck when the right wheels went off the road. Although its condition became progressively worse he had no trouble with the steering. After working hours the station wagon was used for pleasure by those summer employees who lived in a rented house in Burkeville.

Taylor testified that "the car was handled very rough", was turned around by driving into ditches and was driven "off the side of the road". He was riding in the car at the time of the accident and did not notice any difficulty with the steering but he had never driven the car.

Boswell, who on several occasions had driven the station wagon and was a passenger in it when the accident occurred, testified that it was used "in a rough manner" and turned around in fields. "At times, when it was driven off to the side of the road, it would scrape

the bottom of it, go too far off into the ditch". He had driven it the morning before the accident and had not found anything wrong with the steering or any pulling to the right.

Defendant testified that the car operated perfectly until just before the accident when the steering mechanism fell apart. He had driven it to Richmond the afternoon before the accident and returned to Burkeville with a load of stakes and hubs. After work he drove to a dance in Farmville and brought back Boswell and Taylor to a restaurant in Burkeville where two more young men joined them. All five left in the station wagon together and the accident occurred in this manner:

> "I was going toward Crewe on 460, and I heard a popping noise, and it was just a flash second, and I remember seeing a glare of the rocks from the highway. And the second I heard it pop, I tried to spin it to the right and it would not turn. And I turned my head and I remember seeing his car lights on the highway. And I applied the brakes and it spun the steering wheel to the right. And I remember seeing his car lights, and that is the last thing I remember seeing".

Matthews denied that there was anything wrong with the steering before he heard the "popping noise".

The record shows that the station wagon was purchased May 28, 1964 from a Richmond automobile dealer who had owned it for several months, that it carried a State inspection sticker dated May 6, 1964, and that the brakes and front end had probably been inspected at the dealer's before sale.

Defendant contends that Hunt's testimony had no probative value and was inadmissible because it was based upon an assumption of fact as to which there was no evidence in the record. We do not agree. An expert may give an opinion based upon his own knowledge of facts disclosed in his testimony or he may give an opinion based upon facts in evidence assumed in a hypothetical question. *Virginia Ry. Co.* v. *Andrews*, 118 Va. 482, 489, 490, 87 S. E. 577, 580 (1916), writ of error dismissed, 248 U. S. 272; McCormick, *The Law of Evidence* (1954), p. 29; Marshall, Fitzhugh, Helvin & Nash, *The Law of Evidence in Virginia and West Virginia* (1954) sec. 132; 6 Michie's Jurisprudence, Evidence sec. 168. Here, the expert testified from his examination of the broken control arm and the underside of the station wagon that the control arm socket had previously been split

from a shock or blow. He was not asked hypothetical questions based upon an assumption of facts proved by other evidence. His was the direct testimony as to the previous split in the socket. He then gave his opinion as to the sequence of events which followed.

Hunt's testimony was clearly competent and admissible in accordance with principles heretofore approved by this court. In *Lawson* v. *Darter*, 157 Va. 284, 160 S. E. 74 (1931), a doctor-expert was asked a hypothetical question summing up the evidence. He expressed the opinion that the uterus had been displaced and that an operation would be required to cure it. Defendant objected that the expert assumed that the uterus was displaced without having made a physical examination. This court said that it may be that a physical examination was necessary to determine whether the uterus was displaced but the doctor did not think so and "we cannot as a matter of law say that he was wrong". *Id.* at p. 291. The evidence was competent and its weight was for the jury:

> "In matters of this kind which are not of common knowledge we must accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached, and so evidence of this kind is competent unless it is palpably absurd, and it is not made incompetent by the fact that other experts may have reached another conclusion. Always it should be scrutinized with care, but the manner in which it is weighed has nothing to do with its admissibility." *Id.* at p. 293; accord, *Neal* v. *Spencer*, 181 Va. 668, 26 S. E. 2d 70 (1943) (citing *Lawson, supra*).

Defendant next contends that Hunt's opinion that the defective steering mechanism would be noticeable to the driver must yield to the affirmative testimony of witnesses who drove the car that it steered normally.

It is true that defendant and three of plaintiff's witnesses testified that the car steered properly. But one of plaintiff's witnesses had not driven the car for nine or ten days and another had never driven it. The third had driven it on several occasions, including the morning before the accident. Defendant had driven it extensively during the afternoon and evening before the accident and was driving it when the collision occurred. If the defective condition developed and became noticeable within a few hours then, as the expert Hunt stated, Matthews would be the one to know and he might, in fact, be the only one to know. The jury was not required, as a matter of law, to

believe his testimony that there was no noticeable defect in the steering.

We find *Martin* v. *Penn*, 204 Va. 822, 134 S. E. 2d 305 (1964), to be controlling. In that case, Penn was a passenger in a truck operated by Martin which ran off the highway because the "drag link", a part of the steering mechanism, broke, thereby rendering the vehicle uncontrollable.

Five experienced automobile mechanics testified as expert witnesses for plaintiff that from their examination they found that the break in the steering mechanism resulted from excessive wear. They further testified that because of the wear there would have been an abnormal amount of play in the steering wheel which anyone driving the truck could or should have noticed.

Martin denied having any trouble with the truck or any knowledge that anything was wrong with the steering mechanism. One of his witnesses had inspected the truck about five months before the accident, found the steering apparatus free of defects, and attached the State inspection sticker which would have expired a few weeks after the accident. A mechanic also testified for defendant that he had checked the steering apparatus and found it in proper condition when he lubricated the truck about two weeks before the accident.

The jury, under instructions similar to Instructions Nos. 1 and 8 and the instruction on credibility of witnesses in the present case, returned a verdict for plaintiff. Defendant contended that the testimony of the five mechanics, while admissible, was speculative and insufficient to overcome the direct testimony of defendant and his witnesses. This court was unwilling to say that the jury, as a matter of law, could not have accepted plaintiff's evidence rather than defendant's evidence. The court, through Mr. Chief Justice Eggleston, spoke of the weight of expert testimony:

> "It is clear from our prior decisions that we have adhered to the general rule that it is for the jury, or the court trying the case without a jury, to determine the weight to be given the testimony of expert witnesses. *Ford* v. *Ford*, 200 Va. 674, 679, 107 S. E. 2d 397, 401, and authorities there cited. Or, to put the matter another way, in *Pepsi-Cola Bottling Co. of Norfolk* v. *McCullers*, 189 Va. 89, 99, 52 S. E. 2d 257, 261, we quoted with approval the holding in *Webb* v. *Chesapeake & Ohio Ry. Co.*, 105 W. Va. 555, 144 S. E. 100, 103, that 'The jury has a right to weigh the testimony of all the witnesses, experts and otherwise.' See also, 7 Mich. Jur.,

Evidence, sec. 176, pp. 553, 554; 20 Am. Jur., Evidence, sec. 1206, pp. 1056, 1057; 32 C. J. S., Evidence, sec. 569, pp. 389, 390.

"In the present case the undisputed evidence is that the defective steering mechanism caused the accident. Without objection, the court instructed the jury that they were to be the sole judges of the 'credibility of the witnesses and the weight to be given, if any, to their testimony.' It is clear from their verdict that the jury have accepted the testimony of the expert witnesses introduced by the plaintiff that the defendant, 'in the exercise of reasonable care, should have known' that the steering mechanism was defective. It was within their province to reject the testimony of the defendant that he had no prior indication of such defective condition. We cannot say, as a matter of law, that the jury's finding is without evidence to support it." *Martin* v. *Penn,* 204 Va. 822, 826, 134 S. E. 2d 305, 307, 308 (1964).

There are many similarities between the *Martin* case and the present case. A break in the steering apparatus caused each accident. In each case, the only negligence which the evidence tended to prove was operation on the highway when the driver knew or in the exercise of ordinary care should have known of the defective condition of the steering apparatus. In both cases, under similar instructions verdicts were returned for the plaintiffs. In neither case was a "sudden emergency" instruction given.

In the present case, the trial court in effect upheld the sufficiency of the evidence in overruling defendant's motion to set aside the verdict and enter judgment for the defendant on the ground that the verdict was contrary to the law and evidence, and without evidence to support it. The verdict was set aside on another ground and a new trial granted. However, even in cases where the trial court has disapproved directly the verdict of a jury and granted a new trial it has been held that plaintiff's evidence should be considered in its most favorable light and all conflicting evidence and reasonable inferences resolved in his favor. *Comess* v. *Norfolk General Hospital,* 189 Va. 229, 52 S. E. 2d 125 (1949); *Perdue* v. *Patrick,* 182 Va. 398, 29 S. E. 2d 371 (1944).

Taking Hunt's testimony in the light most favorable to plaintiff, we find that, while not without qualifications and inconsistencies, it was sufficient to raise a jury issue.

Although it is the duty of the court to set aside a verdict that is plainly wrong or without evidence to support it, under Code sec.

8-491, where the conclusion depends on the weight to be given credible testimony, the verdict cannot be disturbed. *Norfolk Southern Ry. Co.* v. *Harris*, 190 Va. 966, 59 S. E. 2d 110 (1950).

We cannot say as a matter of law that the first verdict in this case was plainly wrong or without evidence to support it. We therefore conclude that the trial court erred in setting aside the verdict and granting a new trial and that it did not err in overruling defendant's motion to set aside the verdict and enter judgment for the defendant. The verdict for plaintiff for $30,000 returned on June 30, 1966, will be reinstated and judgment is now entered thereon in favor of plaintiff against defendant. All proceedings subsequent to the first verdict are annulled. *Simmons* v. *Boyd*, 199 Va. 806, 102 S. E. 2d 292 (1958).

*Reversed and final judgment.*

HARRISON, J., dissenting.

I dissent. It is clear that the automobile accident which occasioned plaintiff's injury was caused by a mechanical defect in the vehicle which defendant was driving. The sole issue was whether defendant, in the execution of reasonable care, should have known of the defect and not driven the car at the time and place of the accident. The accident occurred because of the separation of the socket joint on the right control arm of the steering mechanism on defendant's automobile. It is admitted that the ball came out of the socket joint just before the accident, causing the defendant to lose control of his vehicle, veer to the left and collide with plaintiff's vehicle.

An examination of the socket disclosed that it had been damaged, "possibly" as a result of a blow from some obstacle to the control arm.

In an effort to show that this condition had developed over a period of time, and that it would have affected the steering mechanism to such a degree as to have been noticeable to the driver, plaintiff relies upon the testimony of George Hunt. Mr. Hunt describes himself as "a mechanical engineer basically, but I have over the last fifteen years or more, investigated a good many incidents of the sort before the Court here today".

Mr. Hunt had never seen, driven or examined defendant's car prior to the collision. This witness evolved a theory that the condition of the socket was the result of some prior damage to the socket joint. He was unable to state when the damage occurred, whether a day, a week or longer—he could not evaluate the time.

His testimony is that the socket was damaged because the control

arm "presumably" struck some obstacle with sufficient force to crack it and start the chain of events. He said that any severe shock could "very readily" rupture or cause the socket to split. He had no personal knowledge that the control arm had ever received a blow of sufficient intensity to cause the rupture, but would "expect" that if the control arm or any part of the front wheel assembly had received a severe blow there would be some displacement of the front wheel, and such that the steering would be affected.

When counsel for defendant objected to this speculation, plaintiff's counsel said to the witness, "Well, state it as your opinion". Hunt then replied, "Well, it is my opinion that this would occur, sir.".

Again, this witness testified that a blow of sufficient magnitude to rupture the socket would displace the control arm from its proper position and the result would be the car could have "a tendency" to pull to the right or left. He was unwilling to evaluate the tendency, whether slight or severe, but said, "This would be the most *probable* result. . . ." And further, "I would *expect* there would be some noise attached to this also. . . .",

When questioned as to the extent of the rupture and how much was the split, Hunt replied: "This I cannot evalaute. No, sir. It was not enough to let the ball out, certainly, but it was split". He admitted that the split may have been just a hairline split and of such minimum degree that it was possible that the naked eye could not see it.

Admittedly, defendant's vehicle had been used to transport men engaged in clearing rights-of-way and surveying. However, there is no evidence that the steering mechanism of this vehicle had ever received any severe blow or that the car had been involved in any accident. A number of witnesses who were thoroughly familiar with the car and its operation had noticed no defect or abnormality in the steering mechanism or the manner in which it operated.

Plaintiff's witness, Nelson Gravatt, was in charge of the vehicle from mid-June to mid-July, 1964, and drove the car daily. He did not notice anything defective or wrong with the steering apparatus of the car. He said it handled in a normal way.

William L. Boswell, Jr., another witness for the plaintiff, drove the car frequently and observed nothing defective about the car or its steering. He last drove the vehicle on the morning of the accident.

Plaintiff's witness, Norman Taylor, rode in the vehicle on the night of the accident, and, so far as he could determine from his observation, the car was driving all right.

The defendant drove the car the entire day of the accident, and over a great distance, and stated that the car operated and steered normally, and that so far as he knew it was in perfect shape. He could detect nothing in driving it that would cause him to think something was wrong. He first intimation of any difficulty in the steering mechanism was when the control arm separated from the joint and the car veered into the path of plaintiff's vehicle.

So we have the positive testimony of four witnesses with an intimate knowledge of the vehicle and the manner in which it operated. All describe it as normal. Certainly we cannot find from their testimony that defendant, in the exercise of reasonable care, should have known of the defect in the steering mechanism—a defect which developed suddenly and caused the accident.

The testimony of Mr. Hunt is speculative and conjectural. It is based upon his theory of what might have happened, and not on facts disclosed by the evidence. His testimony that he would "expect" the defect he detected in the front wheel assembly of the car to have noticeably affected its steering must yield to the positive and affirmative testimony of four other witnesses who said the car operated and steered normally, and to defendant's testimony that he had no knowledge or warning of any defect prior to the accident.

Plaintiff says that this case is controlled by *Martin* v. *Penn*, 204 Va. 822, 134 S. E. 2d 305 (1964), which involved a defective steering mechanism. That case can be clearly distinguished from the one under review. There the plaintiff Penn was riding as a "paying passenger" in the vehicle of the defendant Martin. Penn testified that prior to the accident he noticed that Martin was "having some difficulty" in steering his vehicle. Plaintiff also testified that Martin remarked, "something done happened to my truck", and that shortly thereafter the accident occurred. Thus the defect there was so obvious and patent as to have been and was noticeable to the driver, and also to the passenger in the vehicle.

Also to be noted is the difference in the type and degree of the defect involved in *Martin* v. *Penn, supra* and that in the instant case. There a mechanic, or "expert", who testified regarding the defective steering mechanism (resulting in a break of the drag link) said that the drag link end came loose because it was "worn out" and so defective that the steering wheel would have a lot of play or free motion in it. Another mechanic testified that the drag link was "worn excessively" thereby causing excessive play in the steering wheel. A third mechanic testified that the drag link was in a "worn condition".

A witness called by the defendant testified that the drag link was in fact "worn completely out". The jury was therefore justified in finding that Martin operated a vehicle with a grossly defective steering apparatus, one that was so defective that the plaintiff noticed that the defendant was having difficulty steering the vehicle. It could further have found that in the exercise of reasonable care the defendant not only should have known that something was wrong, but did, prior to the accident, voice this very fact.

In the instant case we are dealing with a hairline defect which was not apparent to the eye. Here we have a defect that no one knows when or how it occurred—a defect which, according to Hunt, most probably could have resulted in a tendency to affect the steering in some degree—slight or severe. There is no evidence in the record that in the exercise of reasonable care a driver of a vehicle should be aware of a latent mechanical defect that manifests itself in such a manner.

The burden was on the plaintiff, Walrod, to prove by a preponderance of the evidence that the defendant Matthews was negligent, and that such negligence was the proximate cause of the collision and his resulting injury. I would hold that he failed to carry the burden, and that accordingly the trial court should have set aside the verdict returned in the first trial and entered final judgment for the defendant.

I concur with the majority that the trial court should have refused to grant a "sudden emergency" instruction. Nowhere was it contended by the plaintiff that defendant was guilty of any negligence subsequent to the break in the socket joint of defendant's vehicle, and there is no evidence in the record of any such negligence.

HARMAN, J., joins in this dissent.