## Richmond

CLAUDE W. NEIGHBORS v. JAMES DOUGLAS MOORE.

December 1, 1975.

Record No. 741090.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Robert C. Wood, III; Henry M. Sackett, III (Edmunds, Williams, Robertson, Sackett, Baldwin & Graves,* on brief), for plaintiff in error.

*Wm. Rosenberger, Jr. (Richard E. Spies,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the court.

On July 2, 1973, about 1:20 p.m., Claude W. Neighbors, the plaintiff below, was operating a motor vehicle north on U.S. Route 29 in Nelson County. As he was in the process of making a left turn, his vehicle was struck by another northbound vehicle driven by defendant James Douglas Moore, who was in the act of overtaking and passing Neighbors.

The jury rendered a verdict of $45,000 in Neighbors' subsequent tort action seeking recovery for personal injuries, but the trial court set the verdict aside and entered final judgment in favor of the defendant upon the ground that, as a matter of law, the plaintiff was guilty of contributory negligence which was a proximate cause of the accident.

We granted the plaintiff a writ of error and, although cross-error has been assigned, the significant inquiry on appeal is whether contributory negligence and proximate cause were jury issues. We conclude that they were and reverse.

Even though the trial court has disapproved the verdict of the jury, under established rules we must consider the evidence in a light most favorable to the plaintiff, drawing from the evidence all reasonable inferences. *Fisher* v. *Gordon,* 210 Va. 523, 526, 171 S.E.2d 835, 837 (1970); *Walrod* v. *Matthews,* 210 Va. 382, 391, 171 S.E.2d 180, 187 (1969).

The accident took place on Route 29 in front of Gormes' Service Station, situated on the west side of the highway. At this location, Route 29 was a two-way, 24-foot roadway running generally north and south. It was intersected by State Route 6 from the east, a short distance north of the scene. Route 29, from a point about one-fourth of a mile south of the scene running north to the Route 6 intersection, was "downgrade [and] fairly straight." The speed limit was 55 miles per hour. The weather was cloudy at the time and the paved highway was dry.

On the service station premises and adjacent to the west edge of Route 29 were several wide driveways separated by grass plots, partly enclosed in concrete curbings. The collision occurred on the highway near the center of one of the driveways, which was located near the middle of the premises.

Route 29 was divided into clearly marked 12-foot lanes. At the southernmost edge of the service station premises on the west side of the highway was a triangular "No Passing" highway sign facing northbound traffic. A single broken center line extended south on Route 29 for at least one-fourth of a mile from a point on the highway opposite the sign. From the point north, and past the Route 6 intersection, the highway lane markings were double traffic lines consisting of a solid line to the east of, and immediately adjacent to, a broken line.

The plaintiff's evidence on the question of liability consisted of photographs of the scene, his own testimony, the testimony of the investigating police officer, and the testimony of an independent eyewitness, who had viewed the accident from the service station premises. This evidence showed that the plaintiff, 55 years of age and a produce salesman at the time, was driving alone in his unloaded 1965 Chevrolet station wagon intending to make a regular business call at the service station. As he was driving north at about 50 miles per hour "down the hill" approaching the point of collision, he looked ahead and saw no oncoming vehicles. He had activated his mechanical left turn signal, which was working properly, when he was about 150 to 200 feet from the point of his turn. He looked into his exterior and interior rearview mirrors and "didn't see anything." He turned, travelling about 25 miles per hour, and while in the southbound lane was struck by the defendant's vehicle as the "front end" of the station wagon was "leaving the west edge of the highway." The plaintiff failed to see the defendant's vehicle at any time before the collision.

Following the impact, the plaintiff's vehicle came to rest headed west, perpendicular to the highway, about a car's length west of the pavement and partially resting on a grass plot to the north of and adjacent to the driveway the plaintiff intended to enter. The defendant's vehicle came to rest headed north at a slight angle to the northwest. Most of the rear of that vehicle was in the southbound lane near the west edge of the highway, while its front was on the west shoulder of the road.

The investigating officer found solid skid marks 100 feet long, entirely in the southbound lane, leading up to the rear of the defendant's

vehicle. The record does not establish with any precision either the point of impact, or the point where the skid marks began in relation to the "No Passing" sign. It is reasonable to infer from the evidence, however, that the point of collision was 90 feet, or more, north of the sign.

The damage to the station wagon was to the left rear corner and side behind the left rear wheel. The defendant's vehicle was damaged on its right front corner and side forward of the right front tire.

The eyewitness testified that the defendant had been travelling in the northbound lane behind the plaintiff at "between 50 and 60 miles an hour" and that he "came in behind Mr. Neighbors' car and just that quick whipped out to pass."

The defendant, 16 years of age, testified that he had been following the plaintiff in the northbound lane; that just prior to the time the defendant "crested . . . the long hill that leads down to the service station," he was 300 to 400 yards behind the plaintiff; that when the defendant was about 250 to 300 feet from the point of impact, he pulled across the broken center line into the southbound lane travelling at 55 miles per hour to pass the plaintiff, who was proceeding at 25 to 30 miles per hour; and, that the plaintiff then "started to turn left into my lane of traffic and I locked up the brakes . . . ." The defendant failed to sound his horn, failed to see the plaintiff's turn signal, and failed to see the "No Passing" sign.

The defendant contends, and the trial court found in a written opinion, that the plaintiff failed to keep a reasonable lookout and was therefore contributorily negligent as a matter of law. We disagree.

■ Among the plaintiff's duties under these circumstances was an obligation to exercise reasonable care, before turning, to first see that the movement could be made in safety. Code § 46.1-216. He was not an insurer of the safety of his turn. In discharging this duty, there was no legal requirement for the plaintiff constantly to look to the rear after he had given a correct signal of his intention to turn in plain view of the drivers of any following vehicles. *Brown* v. *Wright*, 216 Va. 10, 12, 216 S.E.2d 13, 15 (1975); *Richardson* v. *Hackett*, 204 Va. 847, 850, 134 S.E.2d 312, 315 (1964); *Virginia Electric and Power Co.* v. *Holtz*, 162 Va. 665, 669, 174 S.E. 870, 872 (1934).

The defendant argues that "[t]he solid skidmarks, 100 feet long, which began in the southbound lane, opposite a broken traffic line, plus the average reaction time of the defendant, while travelling at 55 miles per hour, proves beyond all doubt that the defendant was in

the passing lane and at least 161 feet from the plaintiff when the plaintiff began to make a left turn in front of the defendant's car, which was open and obvious." This, of course, deals with the timeliness and the quality of the plaintiff's lookout. It is a contention that the *only* inferences which can be drawn from this evidence, and ones upon which reasonable minds could not differ, are that the plaintiff either failed to look when it would have been effective, or, that if he did look he failed to see that which was open and obvious. This contention is without merit, because it is improperly based upon a view of the evidence which is more favorable to the defendant.

In the first place, the positive testimony of the plaintiff is that he did, in fact, look in *both* rearview mirrors. The evidence shows that he looked during the period *after* he gave his left turn signal, when he was about 150 to 200 feet from the point of his turn, and *prior* to the moment he turned his vehicle from a direct line. The evidence does not pinpoint, however, the *exact* location of his car with reference to his turn *when* he looked. On direct examination, the plaintiff testified that he looked "as I got to the turn." During cross-examination he answered "yes" to the following questions: "You looked before you turned?" and "So then you are sure you looked before you started across that road?" Reasonably construed, this testimony could mean the plaintiff looked either when he was only a few feet from the point of his turn from a direct line—a construction more favorable to the defendant—or at some greater distance up to 150 feet preceding his movement from a direct line—a construction more favorable to the plaintiff. Considering that he had no duty to continue to look to the rear and that he had to be on the lookout for oncoming vehicles, including those entering the highway from Route 6 and vehicles leaving the filling station premises, it was for the jury to determine whether the act of looking, within 150 feet of the turn at some unspecified point, was timely under these circumstances.

In the second place, the plaintiff's failure to see the defendant "in the passing lane and at least 161 feet from the plaintiff" is explained, under a proper view of the evidence favorable to the plaintiff, by the fact that the defendant was not *there* to be seen when the plaintiff exercised a timely look to the rear at the indefinite point within 150 feet of his turn. The jury could have concluded that the defendant was beyond the limits of a reasonable lookout to the rear, and in the northbound lane, when the plaintiff looked.[1] Thereafter, as the plain-

---

[1]The plaintiff was under a duty to look only a reasonable distance to the rear. Code § 46.1-289 required the plaintiff's vehicle to be equipped with a mirror so located as

tiff proceeded slowly to the point of his turn having already completed his look to the rear, the defendant rapidly "came in behind" the plaintiff's vehicle at 60 miles per hour and "whipped out to pass", as stated by the eyewitness, without sounding a horn. At that moment, the plaintiff turned from a direct line. The defendant then saw, from his position in the passing lane, this movement of the plaintiff but it was then too late for the defendant, travelling downhill in excess of the speed limit in a prohibited zone,[2] to avoid the accident.

The defendant argues that the plaintiff should have seen him in the passing lane, if the plaintiff looked the instant before he turned. But this argument presupposes a duty on the plaintiff to look at that instant and it assumes that the plaintiff, in fact, looked at that moment. As we have already stated, the plaintiff was not bound to look to the rear continuously. *A fortiori* he was not under a duty to look at the moment he turned, once he had given a correct signal of his intention to turn in plain view of drivers approaching from the rear. The plaintiff's primary obligation, under these facts, was to look where he was going, and not where he had been. Moreover, as we have already demonstrated, the evidence supports a finding that the plaintiff looked at a time prior to the moment he turned, when he was some distance south of the point of his turn, although not at the instant he turned.

We have carefully examined all the cases relied on by the defendant, none of which is controlling. For example, in *Schools* v. *Walker*, 187 Va. 619, 47 S.E.2d 418 (1948), the facts are completely inapposite. In *Matthews* v. *Hicks*, 197 Va. 112, 87 S.E.2d 629 (1955), the negligence of the driver turning from a direct line was held to be a jury question. *Von Roy* v. *Whitescarver*, 197 Va. 384, 89 S.E.2d 346 (1955), involved the failure of a left-turning driver to observe an oncoming, and not overtaking, vehicle.

We hold, therefore, that the plaintiff's negligence, and whether any such negligence was a proximate cause of the accident, were jury issues.

---

to reflect to the operator a view of the highway behind him for a distance of 200 feet. He was not required to examine in his mirror the highway to the rear for the entire distance of about one-fourth of a mile south of the scene of the accident.

[2] Under Code § 46.1-206(e) it was unlawful for the defendant to drive his vehicle to the left of the solid line which commenced at the "No Passing" sign. The fact that he commenced to pass when a single broken line marked the lanes gave defendant no license to continue north in that lane after he reached the solid line. That traffic control marking required the defendant to return to the northbound lane before he reached the solid line. We, therefore, reject the defendant's argument made in support of an assignment of cross-error to the effect that, if a passing movement is commenced across a broken line, it need not be completed before reaching a solid traffic line to the right of a broken line under Code § 46.1-206(e).

Accordingly, the verdict must be reinstated unless any of the assignments of cross-error are well taken. They are not. We have already addressed one assignment of cross-error. *See* Note 2, *supra.* The only others meriting comment deal with the size of the verdict and a refused instruction.

■ We do not agree with the defendant that the verdict was excessive. The plaintiff's medical evidence—the defendant offered none—showed that as a result of the severe impact, he sustained a sprain of his neck and back with associated "marked" muscle spasm. At the time of the accident, the plaintiff's spine was in a weakened condition, and was more susceptible to injury, because of a congenital back defect, prior trauma and arthritis. After the accident, he developed headaches, became nervous, suffered from severe depression, and underwent a complete change in personality. His orthopedic injuries, which resulted in a five percent permanent disability, were made more difficult to treat because of medication he was taking for a serious pre-existing heart condition. At the time of trial, less than eight months after the collision, his accident-related medical expenses approximated $1200 and his wage loss was about $3000. His gross income for the year before the accident had been $6725 and one of his physicians testified that, because of the accident, he would not be able to work at any time in the future. Guided by settled principles, we cannot say, as a matter of law, that the jury's verdict was excessive. *See Edmiston* v. *Kupsenel*, 205 Va. 198, 135 S.E.2d 777 (1964).

■ The defendant contends that it was error for the trial court to refuse Instruction M which, in effect, would have told the jury that in determining the plaintiff's life expectancy, his prior condition of ill health should be considered. There is no merit to this argument. In the first place, the jury was not apprised of the plaintiff's life expectancy, either by the evidence or in an instruction, so Instruction M was irrelevant. The defendant argues, however, that counsel for the plaintiff argued life expectancy to the jury and Instruction M thereby became relevant. But this contention has been waived because defendant's counsel failed to object when such argument was made.

For these reasons, the judgment in favor of the defendant will be reversed, the jury verdict will be reinstated, and final judgment will be here entered on that verdict in favor of the plaintiff.

*Reversed and final judgment.*